UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HC&D, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 22-cv-10224-ADB |
| | * | |
| CASHMAN EQUIPMENT CORP., | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Before the Court is Defendant Cashman Equipment Corporation's ("Cashman's") motion for summary judgment, [ECF No. 72]. For the following reasons, the motion is **DENIED**.

I.   **BACKGROUND**

   A.   **Facts**[1]

HC&D, LLC ("HC&D") is a Hawaiʻi limited liability company. [ECF No. 4 ("Am. Compl.") ¶ 1]; accord [ECF No. 77-13 ("P&S") at 1]. Cashman is a Massachusetts corporation. [Am. Compl. ¶ 2]; accord [P&S at 1].

---

[1] As required by Local Rule 56.1, Cashman filed a statement of undisputed material facts, [ECF No. 74], and HC&D responded with a statement of disputed material facts and a supplemental statement of purportedly undisputed material facts, [ECF No. 78]. Because these filings have barely narrowed the factual dispute before the Court, the Court relies extensively on the record evidence appended to the parties' summary judgment memoranda.

On September 10, 2020, Cashman accepted a conditional offer by HC&D to purchase a barge called the JMC 254. [ECF No. 77-12 ("Offer to Purchase")]. The Offer to Purchase specified a price of $1.9 million and provided that the transaction would close by September 20, 2020, until which time a third party would hold a "10% refundable deposit." [Id. at 1]. The offer was made "as is where is [s]ubject to a certified marine survey to be p[er]formed on or before September 14, 2020." [Id.]. A purchase agreement was to be executed following acceptance of the offer. [Id.]. Prior to making the offer, HC&D had received minimal information about the barge—namely, a condition and valuation report from 2017 and a statement by Cashman that the barge had recently undergone certain repairs. [ECF No. 73-3]; [ECF No. 73-4].

Over the following weeks, the parties engaged in ongoing communications, which apparently occurred mostly by telephone, see, e.g., [ECF No. 77-1 at 12–13], and were not well-documented, at least not in the deposition excerpts attached to the parties' summary judgment motions. Nonetheless, the following points are evident. On September 11, 2020, at Cashman's request, two marine surveyors conducted a certified condition and valuation survey of the JMC 254, [ECF No. 77-3 ("NVI Survey")], which was then provided to HC&D by its third-party broker, Rod Tomkins,[2] who was functioning as the main point of contact between the two parties. See [ECF No. 77-24 at 2–3 (Cashman providing the survey to Tomkins)]; [ECF No. 77-16 at 1 (HC&D discussing the survey with Tomkins)]. Tomkins followed up with Cashman to request a gauging report that would indicate the steel depth at various parts of the barge, see [ECF No. 77-24 at 2], and Cashman provided Tomkins with a gauging report bearing Cashman's

---

[2] HC&D had previously hired Tomkins to help it sell a different barge and planned to pay Tomkins a commission if he successfully found a replacement. [ECF No. 73-1 at 4–5].

2

logo, which had been performed in 2019 by Precision NDT & Consulting ("Precision"). [ECF No. 73-8 at 1–2]; [ECF No. 77-18 ("Precision Gauging Report")]. After reading the 2020 condition and valuation survey, HC&D asked Tomkins about water that was present in many of the barge's compartments and about a note that the barge was currently under repair. [ECF No. 77-16 at 1]. Tomkins, allegedly relying on information provided by Cashman, see [id.], assured HC&D that the water was just from rain and that the repairs were simply outfitting the boat to pass through the Panama Canal. [Id.].

On September 28, 2020, the parties executed a final purchase and sale agreement (the "P&S"), wherein HC&D agreed to pay $1.9 million for the JMC 254. [P&S ¶ 1]. The P&S provided:

> The [JMC 254] is being sold and purchased, in its absolute current condition, AS IS-WHERE IS, without any warranties, or representations, express or implied, as to its condition, merchantability, fitness for any particular purpose, seaworthiness, or qualification for classifications or certification. Other than the warranty of title . . . , any warranties and/or representation . . . either express o[r] implied are explicitly disclaimed by the Buyer and disavowed by the Seller.

[P&S ¶ 4]. HC&D later found out that the barge was in very poor condition, requiring more than $2 million in repairs. See [ECF No. 77-27 (showing water entering the barge from a hole in the hull)]; [ECF No. 77-26 (describing repairs needed)]; [ECF No. 77-31 ¶¶ 7, 15 (assisting HC&D in obtaining a price quote for repairs)]; [ECF No. 77-29 (presenting a price quote)]. HC&D now alleges that it relied on fraudulent representations by Cashman in deciding to purchase the barge. See [Am. Compl. ¶¶ 92–119].

### B.     Procedural History

HC&D filed its original Complaint on February 10, 2022,[3] [ECF No. 1], and then the operative Amended Complaint on April 5, 2022, [Am. Compl.].  The Amended Complaint named both Cashman and Precision as defendants.  See [id. at 1].  On May 13, 2022, Cashman moved to dismiss for failure to state a claim, [ECF No. 9], which HC&D opposed, [ECF No. 13], and on August 11, 2022, Precision moved to dismiss for lack of personal jurisdiction, [ECF No. 20].  On September 21, 2022, Plaintiff moved to stay Precision's motion to dismiss and to transfer the entire case to the Western District of Louisiana.  [ECF Nos. 25, 27].  Precision and Cashman both opposed the motion to transfer.  [ECF Nos. 29, 30].  After a motion hearing and several supplemental filings, [ECF Nos. 38–43], the Court ultimately severed and transferred HC&D's claims against Precision while retaining jurisdiction over HC&D's claims against Cashman.  [ECF Nos. 45, 46].

On November 14, 2023, Cashman renewed its motion to dismiss for failure to state a claim.  [ECF No. 52].  Plaintiff opposed the motion on November 29, 2023, [ECF No. 55], and Cashman filed a reply on January 5, 2024, [ECF No. 58].  The case was subsequently reassigned to this session on October 4, 2024.  [ECF No. 61].  On October 30, 2024, the Court partially granted Cashman's motion to dismiss, permitting only HC&D's fraud and fraudulent inducement claims to continue, see [ECF No. 62 at 1, 16].  Following the close of discovery, see [ECF Nos. 67, 68, 71], Cashman filed the instant motion for summary judgment, [ECF No. 72].  HC&D opposed on October 17, 2025, [ECF No. 77], and Cashman replied on November 7, 2025, [ECF No. 81 ("Reply")].

---

[3] The case was initially assigned to another session of this Court.

## II.     LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995)), and it is genuinely disputed if "the evidence of record permits a rational factfinder to resolve it in favor of either party," id. at 4–5 (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "[T]he moving party must direct [the Court] to specific evidence in the record that would be admissible at trial," Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015), and show that the evidence either "negates an essential element of the non-moving party's claim," id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)), or "demonstrate[s] that the non-moving party will be unable to carry its burden of persuasion at trial," id. at 5 (quoting Carmona, 215 F.3d at 132).  Once the moving party has identified such evidence, the burden shifts to the party opposing summary judgment to "demonstrate that a trier of fact could reasonably resolve [each issue on which she would bear the burden of proof at trial] in her favor." Borges, 605 F.3d at 5 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

The Court reviews "the entire record in the light most hospitable to the party opposing summary judgment," Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)), and draws all inferences "in the light most favorable to the party opposing the motion," Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir.

1979)), but it will not credit "conclusory allegations, improbable inferences, [or] unsupported speculation." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quoting Medina-Muñoz, 896 F.2d at 8).

## III.    ANALYSIS

The elements of fraud and fraudulent inducement under Massachusetts law[4] are the same. See Katz v. Belveron Real Estate Partners, LLC, 28 F.4th 300, 310 (1st Cir. 2022) (citing United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 199 (D. Mass. 2004)). To prevail at trial, HC&D must show (1) a knowingly false representation by Cashman, (2) made with the intent to deceive HC&D, (3) concerning a material fact, (4) on which HC&D reasonably relied, and (5) which resulted in injury to HC&D. See id. (quoting Harvard, 323 F. Supp. 2d at 199). HC&D must allege the false representation with "particularity," Fed. R. Civ. P. 9(b), meaning that the "who, what, where, and when" must be precisely stated. Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).

### A.    Alleged Misrepresentations by Cashman

The Court first clarifies which representations are at issue. The Court noted three alleged misrepresentations pleaded with specificity at the motion to dismiss stage, see [ECF No. 62 at 8], and HC&D has now introduced some evidence of each of them. First, on September 11, 2020, Cashman represented that it had recently renewed the barge's five-year certification and

---

[4] The Court notes that the parties have litigated this case under Massachusetts law from the outset, and where "all parties indicate, at least implicitly, that [certain] law controls, and they have briefed and argued the [instant issue] on that basis," courts in the First Circuit "abide by the parties' choice" provided that it is plausible, though it may not be correct. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011). Accordingly, the Court will apply Massachusetts law to this action.

addressed any related maintenance issues.  See [ECF No. 77-24 at 2].  Second, on September 14, 2020, Cashman provided the Precision Gauging Report to HC&D, which contained representations about the barge's steel wastage and other measurements.  See [Precision Gauging Report]; [ECF No. 73-8 at 1–2].  And third, on September 17, 2020, Cashman may have represented that water observed in the hull, which had been noted in the Condition and Valuation Survey conducted on September 11, 2020, see [ECF No. 77-16 at 1]; [NVI Survey], was "rain water from [a] tank inspection," see [ECF No. 77-16 at 1].[5]  The Court analyzes these three representations as the specific bases for Cashman's fraud claim and considers whether they satisfy the elements of fraud under Massachusetts law.

### B.     Knowingly False Representations

Drawing all reasonable inferences in HC&D's favor, the record shows a genuine dispute as to whether each of these alleged representations was knowingly false.  There is a genuine dispute concerning whether the statements were truthful.  With regards to the water in the hull, one witness testified that while the JMC 254 was under Cashman's ownership, it was regularly ballasted, including with brackish water, [ECF No. 77-11 at 13], suggesting one possible alternative source of the water discussed by the parties, and HC&D has filed a video showing a leak in the hull, [ECF No. 77-27], indicating another possible source.  As to the five-year certification and related maintenance issues, another witness testified that Cashman's statements about the barge's condition and five-year certification did not appear compatible with the actual

---

[5] Cashman disputes making this statement, see [Reply at 3–4], and the evidence in the record only shows an email in which Tomkins writes to HC&D: "As discussed . . . reply to your 3 questions[:] . . . Water is rain water from tank inspection."  [ECF No. 77-16 at 1].  Nonetheless, the Tomkins email provides circumstantial evidence that Cashman told Tomkins the water was from a tank inspection.

condition that the barge was in when it arrived in Long Beach. [ECF No. 77-2 at 21]; see also [id. at 16 ("I can't reconcile it. I have no way of reconciling . . . those reports to what I saw.")]. Finally, regarding the Precision Gauging Report, a witness stated that based on his experience working with similar barges and surveys, "it is not physically possible for the Precision Gauging Report to be accurate given the physical condition of the [barge]." [ECF No. 77-31 ¶ 12]. Though Cashman has provided its own evidence against these conclusions, HC&D has provided enough evidence to survive summary judgment on the falsity of Cashman's representations.

There is also a triable issue as to whether Cashman's alleged misrepresentations were knowing. In the motion before the Court, Cashman does not dispute that the source of water in the barge and information about the barge's certification and repair history were knowable, but it does argue that it did not in fact know the Precision Gauging Report was inaccurate. Specifically, it argues that it could not have known about the report's accuracy because it was created by a third party, Precision, under supervision of the American Bureau of Shipping, and because it concerned a technical subject that was outside of the experience of Cashman's employees. See [Reply at 4–6]; [ECF No. 73-10 at 2–3 (describing how a gauging report is conducted)]; [ECF No. 77-4 at 3–4 (same)]. HC&D has introduced evidence that at least two members of the maritime industry knew, from only a visual inspection of the physical condition of the JMC 254, that the Precision Gauging Report could not have been accurate, and this evidence is sufficient to prevent summary judgment from issuing to Cashman on this point. See [ECF No. 77-31 ¶¶ 11–14]; [ECF No. 77-2 at 8–11]. By analogy to the automotive context, certain conclusions that a car mechanic might draw can be disproven by a layperson on a simple visual inspection, while others might require considerable expertise or even tools to disprove. Here, the extent of Cashman's experience in the industry, the technical knowledge that it should

have had, and whether it would have known from that experience that the gauging report was inaccurate are all questions of fact properly resolved at trial.

### C. Intent to Deceive

Subjective intent is a fact-intensive inquiry, and if a factfinder concluded—as it might, per the Court's analysis elsewhere in this Order—that Cashman knowingly shared inaccurate information with HC&D, it could also infer from the circumstances that Cashman did so with an intent to deceive HC&D.  Cf. Sullivan v. John Hancock Mut. Life Ins. Co., 174 N.E.2d 771, 774 (Mass. 1961) ("The issue of intent to deceive was properly left to the jury.").  Accordingly, Cashman has not shown that it is entitled to summary judgment on this point.

### D. Materiality

HC&D has shown at least a triable issue as to whether each one of Cashman's alleged misrepresentations concerned facts material to HC&D's decision to purchase the barge.  E.g., [ECF No. 77-1 at 18–20 (discussing factors HC&D considered in purchasing the barge)].

### E. Reasonable Reliance

The reasonableness of HC&D's reliance turns on (1) whether HC&D was bound to purchase the barge by its initial Offer to Purchase or only by the final P&S, and (2) whether HC&D's alleged reliance on Cashman's representations would have been reasonable under the terms of whichever agreement bound it to purchase the barge.

#### 1. The Offer to Purchase

Cashman contends that HC&D's Offer to Purchase created a binding contract.  [ECF No. 73 ("Cashman Mem.") at 10 (first citing McCarthy v. Tobin, 706 N.E.2d 629, 631 (Mass. 1999); and then citing Battle v. Howard, 185 N.E.3d 1, 11 (Mass. 2022))].  HC&D responds that the Offer to Purchase was merely a statement of the parties' shared intent to seek an agreement and

did not bind them. [ECF No. 77 ("HC&D Mem.") at 7–8]. The Court agrees with Cashman that under Massachusetts law, the Offer to Purchase created a binding agreement.

An accepted offer to purchase is binding if the parties intend it to be. See McCarthy, 706 N.E.2d at 631 (first citing Schwanbeck v. Federal-Mogul Corp., 592 N.E.2d 1289, 1292 (Mass. 1992); and then citing Levenson v. L.M.I. Realty Corp., 575 N.E.2d 370, 372 (Mass. App. Ct. 1991)).[6] The parties' intent is determined in reference to their objective manifestations. See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 864 N.E.2d 518, 532 n.35 (Mass. App. Ct. 2007); accord Armstrong v. White Winston Select Asset Funds, LLC, 648 F. Supp. 3d 230, 247 (D. Mass. 2022). If an accepted offer to purchase includes all material terms or leaves open only terms that are customarily resolved according to established norms, Massachusetts courts will infer that the parties intended to be bound and enforce the agreement accordingly. See McCarthy, 706 N.E.2d at 631–32.

Here, the Offer to Purchase contained all material terms. The parties agreed on a purchase price, a closing date, an "as is where is" clause that would resolve any outstanding disputes related to the fitness for use and location of the barge, and two conditions: (1) the performance of a satisfactory certified marine survey, and (2) the barge being free and clear of all encumbrances. [Offer to Purchase at 1]. HC&D maintains that the Offer to Purchase did not

---

[6] HC&D asserts that McCarthy has only ever been applied to contracts for real property. [HC&D Mem. at 8]. Although Massachusetts courts occasionally distinguish between types of property in the context of contracts, they only do so where a distinction between different kinds of property, such as in contracting practice or intrinsic characteristics, would affect the legal analysis. E.g., Lyman v. Lanser, 231 N.E.3d 358, 365–66 (Mass. App. Ct. 2024) (noting that the adequacy and availability of certain remedies may depend on "the character of the property," id. at 365 (quoting Jones v. Newhall, 115 Mass. 244, 248 (1874))). HC&D has not identified, nor has the Court found, any distinction between real and personal property that would limit the application of McCarthy's holding to the facts of this case.

expressly state that it created binding obligations, [Offer to Purchase at 1], but the standard under Massachusetts law is the opposite: an offer that contains all material terms must expressly state that it does not create a binding agreement to avoid doing so. See McCarthy, 706 N.E.2d at 632 n.3. HC&D also argues that the Court should distinguish McCarthy because "the parties here never represented that time was of the essence and did in fact execute a [purchase agreement]," unlike the parties in that case. [HC&D Mem. at 8]. The Court disagrees. The inference that two parties intended to be bound by an agreement is not affected by their decision to leave out a particular term, such as a time-is-of-the-essence clause, nor by their subsequent compliance with the terms of the agreement. What matters is whether the agreement contains all material terms, and HC&D does not assert that any material terms were missing from the Offer to Purchase. See [HC&D Mem. at 7–9]. As a written offer containing all material terms, the accepted Offer to Purchase evinced the parties' objective intent to be bound and thus created a binding contract.

Nevertheless, HC&D did retain a limited right to walk away from the agreement under the following provision: "This offer is 'as is where is' [s]ubject to a certified marine survey to be p[er]formed on or before September 14, 2020," [Offer to Purchase at 1]. "The interpretation of a contract is a question of law for the court," Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1263 (Mass. 2007), which "must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties," Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008) (citing Gen. Convention of New Jerusalem in the U.S., Inc. v. MacKenzie, 874 N.E.2d 1084, 1087 (Mass. 2007)). The Court concludes (and the parties agree, see [HC&D Mem. at 9]; [Cashman Mem. at 4–7]) that this provision created a condition precedent, meaning that the parties would not be bound until its requirements were met. See Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d

11

283, 288 (Mass. 1991). The Court thus turns to parsing the terms "subject to" and "certified marine survey."

The natural reading of the "subject to" clause is that it imposed a limit on the offer, making clear that HC&D would only purchase the barge if a "certified marine survey" showed that the barge was in adequate condition. The clause did not require HC&D to conduct a survey; rather, the clause empowered HC&D to review a survey "certified" by a third party and to only consummate the purchase upon a determination that the survey showed that the boat was in satisfactory condition. The term "certified marine survey," by contrast, is ambiguous. Whether a term is ambiguous is a question of law to be decided by the Court, see Eigerman, 877 N.E.2d at 1263 (citing Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)). Here, the plain language of "certified marine survey" does not identify a specific test or set of tests, or a specific reviewing body to conduct or certify the examination. Nor does the term, to the knowledge of the Court, have a commonly accepted industry-specific meaning. HC&D understood it to mean "[a] survey that . . . represented the seaworthiness and condition of the vessel," [ECF No. 77-1 at 10], while Cashman asserts that it could have referred to any one of several surveys, see [Cashman Mem. at 4–5 (giving examples of different marine surveys)]. Accordingly, because the term is "ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial," Seaco Ins. Co. v. Barbosa, 761 N.E.2d 946, 951 (Mass. 2002).

In sum, HC&D's Offer to Purchase created a binding agreement subject to a condition precedent, which reserved to HC&D the right to review a "certified marine survey" and withdraw its offer if the survey's findings were not satisfactory. The meaning of "certified marine survey" is a question of fact for trial. Drawing all inferences in HC&D's favor, a

factfinder could conclude that the clause in its entirety permitted HC&D to rely on the NVI Survey, the Precision Gauging Report, and Cashman's answers to the questions that HC&D asked with regards to those materials before deciding to proceed with the purchase.

### 2. The P&S

After HC&D reviewed the materials provided by Cashman, the parties executed the P&S, which Cashman argues expressly disclaimed any representations on which HC&D may have relied. Section Four of the P&S provides:

> The said Vessel is being sold and purchased, in its absolute current condition, AS IS-WHERE IS, without any warranties, or representations, express or implied, as to its condition, merchantability, fitness for any particular purpose, seaworthiness, or qualification for classifications or certification. Other than the warranty of title contained in Paragraph 5 below, any warranties and/or representation (as the case may be) either express o[r] implied are explicitly disclaimed by [HC&D] and disavowed by [Cashman].

[P&S ¶ 4]. Cashman contends that this provision renders any reliance by HC&D on Cashman's alleged prior misrepresentations "contradict[ory] [to] the terms of the parties' agreement," in which case it would be "unreasonable as a matter of law." HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F. 3d 564, 571 (1st Cir. 2014); see [Cashman Mem. at 16–18]. The Court rejected this argument at the motion to dismiss stage, see [ECF No. 62 at 10 & n.5], and reaches the same conclusion here.

As the Court previously explained, in order for a party's reliance on prior representations to be unreasonable in light of a subsequent contractual provision, the provision must be "specifically addressed [to] the particular point at issue," HSBC, 745 F.3d at 573 (quoting Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995)), and "directly contradictory to the complained-of misrepresentations." Id. Cashman argues that the language of Section Four satisfies this standard, because it refers to specific characteristics, such as the vessel's

13

"seaworthiness" and "qualification for classifications or certification," distinguishing it from a "generic" disclaimer. [Cashman Mem. at 17]. The Court disagrees. HC&D alleges that Cashman falsely represented (1) the origin of water on the barge's interior, (2) the recency of the barge's certification and the completion of associated repairs, and (3) the amount of steel wastage and other wear exhibited by the barge. The terms of Section Four do not "flatly contradict[]," Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1986), any of those alleged representations by Cashman, nor do they particularly disclaim HC&D's reliance on those representations, so Section Four does not bar HC&D from asserting that its reliance on Cashman's representations was reasonable.

### 3. Injury

The record is clear that HC&D was injured by the barge's subsequent failure. E.g., [ECF No. 77-29 (providing price quotes for repairs to the barge)].

## IV. Cashman's Affirmative Defenses

In its memorandum opposing Cashman's motion for summary judgment, HC&D briefly argues that the Court should grant summary judgment to HC&D on Cashman's affirmative defenses. [HC&D Mem. at 19–20]. HC&D has not filed its own motion for summary judgment. While courts may grant summary judgment sua sponte once discovery has reached a "sufficiently advanced" stage, they may only do so if the party against whom summary judgment would be granted has had "appropriate notice and a chance to present its evidence on the essential elements of the . . . defense." Berkovitz v. Home Box Office, 89 F.3d 24, 29 (1st Cir. 1996). In the present procedural posture, the Court concludes that Cashman has not received such a chance, and declines to grant summary judgment to HC&D on Cashman's affirmative defenses.

14

V.  **CONCLUSION**

    For the above reasons, Cashman's motion for summary judgment is **<u>DENIED</u>**.

    **SO ORDERED.**

January 29, 2026                                                    <u>*/s/ Allison D. Burroughs*</u>
                                                                                          ALLISON D. BURROUGHS
                                                                                         U.S. DISTRICT JUDGE