UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HC&D, LLC, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 22-cv-10224-ADB |
| | * | |
| CASHMAN EQUIPMENT CORP., | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Following an eight-day trial in May 2026, [ECF Nos. 131, 136, 140, 144, 146, 151, 154,

156], a jury found against Defendant Cashman Equipment Corp. ("Cashman") and awarded

Plaintiff HC&D, LLC ("HC&D") $1,119,231.19 in damages, [ECF No. 161].  During trial, both

parties timely moved for judgment as a matter of law, and the Court denied both motions.  On

June 11, 2026, the parties renewed their motions for judgment as a matter of law and moved in

the alternative for a new trial, [ECF No. 163]; [ECF No. 164],[1] and on June 25, 2026, each party

opposed the other's motion, [ECF No. 166]; [ECF No. 167].  With leave of Court, HC&D filed a

reply brief on June 26, 2026, [ECF No. 170].  For the following reasons, both motions are

**DENIED**.

---

[1] Cashman argues that HC&D's motion and the supporting memorandum should be denied as untimely because they were filed at 6:01 p.m. and 6:09 p.m., respectively, on the day they were due.  [ECF No. 167 at 2].  For the reasons articulated in HC&D's reply brief, [ECF No. 170], the Court will accept the motion and memorandum and consider both on the merits.

## I.    EVIDENCE AT TRIAL

In reaching its verdict, the jury could have found the following facts based on the evidence presented at trial.[2]

HC&D is a Hawaii-based company that makes ready-mix concrete and supplies it to contractors for building and construction projects.  HC&D uses deck barges to transport its product between the Hawaiian islands.  In 2020, it purchased the deck barge at issue here—now called the Kawika H, previously called the JMC 254—to replace a deck barge that was reaching the end of its useful life.  To assist with the purchase of a barge, HC&D hired a broker to identify potential replacements and worked with a tug-and-barge operating company, Sause Brothers, to assist HC&D in evaluating the potential barges identified by the broker.

In August 2020, as part of its initial research on the JMC 254, HC&D received a 2017 condition-and-valuation report (the "2017 C&V"), which presented sufficient concerns about the barge's condition that HC&D would not have purchased it without further information.  Thereafter, HC&D executed an offer to purchase with Cashman, which provided that the offer was made "subject to a certified marine survey to be performed on or before September 14,

---

[2] The jury heard live testimony from Rick Volner, HC&D's senior vice president of operations; Ronald Greger, the owner of a marina that has been storing the barge; Dale Sause, president of Sause Brothers, a company that helped HC&D in connection with the disputed transaction; Nicholas Leik, a Sause Brothers employee who had previously worked as a surveyor for the American Bureau of Shipping; Arne Stenseng, an engineer who conducts private surveys of vessels for ship owners and operators; Jamie Guy, Cashman's fleet manager; Ray Riddle, a Cashman employee who handles barge sales once the purchase price has been negotiated; Fred Rodolf, president of a firm that helps clients identify vessels in the marketplace; Robert Bartlett, a mechanical engineer who tests and models steel wastage and failure in barges; and George Wittich, a marine consultant who has worked on hundreds of barge sales.  The jury was also read excerpts from the depositions of Anoop Palassery, a surveyor for the American Bureau of Shipping who conducted a survey of the barge; Marty Dupre, a yard supervisor for Cashman; James Cashman, Cashman's CEO; and Frank Qiu, a surveyor for the American Bureau of Shipping who worked briefly on a survey of the barge.  See generally [ECF No. 158].

2020." Pursuant to that agreement, Cashman provided HC&D with three documents: an updated condition-and-valuation report from September 2020 (the "September 2020 C&V"), a gauging report that had been performed by a certified surveyor (the "2019 Gauging Report"), and a vessel survey done by the American Bureau of Shipping ("ABS"), a third-party company that certifies ships to certain standards. In communications following the offer to purchase, Cashman represented that it was being transparent and called HC&D's attention to a surveyor's comment that the barge was in good condition.

The September 2020 C&V showed no recommendations for repairs, and valued the JMC 254 at $2.2 million. The 2019 Gauging Report included Cashman's logo on the cover page, and showed that the steel in the barge was in good condition, with no areas showing wastage outside of allowable limits. Finally, the vessel status report from ABS indicated that the JMC 254 had been certified through 2024 in two key respects: it had both a "class" certificate and a "load line" certificate. These three reports are standard in the industry, and because they are conducted by third parties, it is common in the industry to rely on them in making purchasing decisions.

Over the course of the transaction, Cashman did not advise HC&D of certain other facts, including the following: After the 2019 Gauging Report had been conducted, ABS ordered Cashman to replace certain visibly deteriorating steel in the barge, despite the fact that the 2019 Gauging Report did not indicate that any steel was wasted. Rather than repair the steel, however, Cashman placed the JMC 254 in lay-up status—meaning that the barge's ABS certification was suspended and the barge could not be used for certain purposes that required a particular certification. While it was in lay-up status, Cashman chartered it to several companies. The barge developed leaks, which were repaired in November 2019. In March 2020, Cashman went through the process of reactivating the JMC 254's ABS certifications, which included

completing the repairs previously ordered by ABS.  During the reactivation process, Cashman did not report that it had repaired leaks in the JMC 254 in November 2019.  In July 2020, Cashman commissioned a C&V ("the July 2020 C&V"), which showed substantial differences from the later-conducted September 2020 C&V[3] but was never provided to HC&D.

On the basis of the 2017 and September 2020 C&Vs, the vessel status report, and the 2019 Gauging Report, HC&D decided to move forward with the purchase and ultimately bought the barge at the end of September 2020 for roughly $1.9 million.  HC&D arranged for the barge, renamed the Kawika H, to be towed from Louisiana at the end of December 2020, first through the Panama Canal to Long Beach, California, and then from Long Beach to Hawaii.  When the Kawika H arrived in Long Beach in February 2021, it had a leak and structural damage that led HC&D to conclude that it would be unsafe to transport to Hawaii.  HC&D commissioned another steel gauging report, which showed that the steel in the barge was far more degraded than reflected in the documents HC&D had reviewed prior to purchasing.  Given the estimated cost of the repairs needed to get the Kawika H in good enough condition to travel to Hawaii, HC&D decided to forego the repairs and not to move the barge to Hawaii.  It concluded that the barge was ultimately worth between three and four hundred thousand dollars as scrap.  After deciding that the barge could not make the trip to Hawaii, HC&D moved the Kawika H to Oakley, California, and paid to moor it indefinitely, including through trial.  Prior to the tow to Oakley, for insurance purposes, HC&D obtained a new condition and valuation report, which valued the barge at roughly $1.2 million.

---

[3] Whereas the September 2020 C&V showed no recommendations for repairs and valued the barge at $2.2 million, the July 2020 C&V included seven recommendations for repairs and valued the barge at approximately $1.4 million.

In purchasing the barge, HC&D incurred significant costs, including amounts owed to their broker and Sause Brothers, as well as for towing, insurance, survey, repair, and mooring fees. As to the barge's commercial viability and present value, Cashman's expert, George Wittich, testified that the barge retained significant value in its current condition, and could be put to use on a variety of inland projects, for revenue of $1,000 to $1,500 dollars per day, while one of HC&D's experts, Fred Rodolf, testified that the barge was only worth scrap value.

## II.    LEGAL STANDARDS

### A.    Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," the court may both "resolve th[at] issue against the party" and—if a claim or defense can only "be maintained or defeated . . . with a favorable finding on that issue"—grant judgment as a matter of law against the party on that claim or defense. Fed. R. Civ. P. 50(a)(1). The motion must be made "before the case is submitted to the jury," Fed. R. Civ. P. 50(a)(2), and if denied, it may be renewed within "28 days after the entry of judgment," Fed. R. Civ. P. 50(b), accompanied, if the party wishes, by "an alternative or joint request for a new trial under Rule 59," id.

Both parties' motions assert, for different reasons, that the evidence was not sufficient to support the jury verdict. See [ECF No. 163 at 2–4]; [ECF No. 165 at 1–2, 9–13]. "A party seeking to overturn a jury verdict faces an uphill battle." Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005); see ZipBy USA LLC v. Parzych, 171 F.4th 55, 66 (1st Cir. 2026) ("Our review is 'weighted toward preservation of the jury verdict . . . .'" (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002))). In evaluating a motion for

judgment as a matter of law, the Court must consider "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." Osorio v. One World Techs. Inc., 659 F.3d 81, 84 (1st Cir. 2011) (quoting Granfield v. CSX Transp., Inc., 597 F.3d 474, 482 (1st Cir. 2010)). "A renewed motion for judgment as a matter of law under Rule 50(b) may be granted 'only if a reasonable person, on the evidence presented, could not reach the conclusion that the jury reached . . . .'" Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 60 (1st Cir. 2019) (quoting Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 71 (1st Cir. 2008)); accord ZipBy, 171 F.4th at 66.

### B.     New Trial

Rule 59 empowers the Court to "grant a new trial," Fed. R. Civ. P. 59(a)(1), "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court," Fed. R. Civ. P. 59(a)(1)(A).[4]  This standard "differ[s]" from the Rule 50 standard for judgment as a matter of law, and the Court's "power to grant a motion for a new trial is much broader than its power to grant [judgment as a matter of law]," Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009), meaning that "a new trial may be granted even when judgment as a matter of law may not," Sánchez v. Foley, 972 F.3d 1, 16 (1st Cir. 2020).  "In effect, [Rule 59] authorizes a district court to override a jury verdict and order a new trial 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" Teixeira v. Town of Coventry ex rel. Przybyla, 882 F.3d 13, 16 (1st Cir. 2018) (quoting Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006)); accord Thomas & Betts Corp., 915 F.3d at 60.  "A

---

[4] "Federal law governs the issue of whether to order a remittitur or a new trial on damages in a diversity case." Brayman v. 99 W., Inc., 116 F. Supp. 2d 225, 230 (D. Mass. 2000), aff'd, 26 F. App'x 24 (1st Cir. 2002).

district court can independently weigh the evidence when evaluating a motion for a new trial . . . and therefore can determine that a witness or evidence lacks credibility," Rodríguez-Valentin v. Drs.' Ctr. Hosp. (Manati), Inc., 27 F.4th 14, 21 (1st Cir. 2022), but "[i]n general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial," Sánchez, 972 F.3d at 16 (alteration in original) (quoting Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 551 (1st Cir. 2019)).  When a new trial is sought on damages—as opposed to liability—the Court considers the evidence in the light most favorable to the jury's assessment of damages.  See, e.g., Rodríguez-Valentin, 27 F.4th at 22; Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009); Gil de Rebollo v. Miami Heat Ass'ns, Inc., 137 F.3d 56, 63 (1st Cir. 1998); Milone v. Moceri Fam., Inc., 847 F.2d 35, 37–38 (1st Cir. 1988).

## III.    DISCUSSION

### A.    Cashman's Motion

Cashman seeks judgment as a matter of law on liability,[5] arguing that "there is no legally sufficient evidentiary basis for a reasonable jury to find in Plaintiff's favor on one or more essential elements of its claims."  [ECF No. 163 at 1].[6]  The only claim before the jury was fraud or fraudulent inducement, and the jury was instructed on the following six elements: (1) a

---

[5] Cashman relies on the same arguments in support of its motion for a new trial, see [ECF No. 163 at 5], so the Court addresses both motions together.

[6] Cashman also generally asserts that the jury could have found it liable only if it drew improper inferences from "absence, assumption, or speculation," and further re-incorporates all arguments made in its summary judgment motion.  [ECF No. 163 at 4].  The Court will not further discuss these undeveloped and vague arguments, because, as HC&D notes in opposition, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  [ECF No. 166 at 2–3 (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))].

7

knowing or reckless false representation, (2) the materiality of that representation, (3) intent, (4) reliance, (5) reasonableness of reliance, and (6) financial loss.

### 1.    Knowing or Reckless False Representation

Cashman argues that HC&D failed to offer evidence (1) of statements made or adopted by Cashman, (2) that any statements attributable to Cashman were false, and (3) that Cashman was knowing or reckless as to the falsity of those statements.  [ECF No. 163 at 2].  The Court disagrees.

Viewing the evidence at trial in the light most favorable to the jury verdict, the jury reasonably could have concluded (1) that Cashman's presentation of the 2019 Gauging Report to HC&D with its own logo on the cover sheet amounted to an endorsement of the accuracy of the gauging report's contents; (2) that the contents of that report were inaccurate—either because they showed steel in good condition that was actually in poor condition at the time of the gauging, or because the subsequent leaks and ABS-ordered repairs indicated that the condition of the steel in the barge had deteriorated since the report was conducted; and (3) that Cashman knew that the 2019 Gauging Report was inaccurate at the time that it provided it to HC&D.[7] Similarly, the jury reasonably could have concluded (1) that Cashman's assurance to HC&D that a surveyor had concluded the barge was in good condition amounted to an endorsement of the

---

[7] As the Supreme Judicial Court of Massachusetts has explained:
> "Deception need not be direct to come within reach of the law.  Declarations and conduct calculated to mislead and which in fact do mislead . . . are enough to constitute fraud." . . . In addition, "[f]ragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies" (citation omitted).

Sullivan v. Five Acres Realty Tr., 166 N.E.3d 463, 472 (Mass. 2021) (third and fourth alterations in original) (citation omitted) (first quoting Bos. Five Cents Sav. Bank v. Brooks, 34 N.E.2d 435, 437 (Mass. 1941); and then quoting Kannavos v. Annino, 247 N.E.2d 708, 711–12 (Mass. 1969)).

accuracy of the statement; (2) that the barge was not, in fact, in good condition; and (3) that Cashman knew the barge was not in good condition at the time that it reiterated that statement to HC&D.

### 2. Materiality

Cashman argues that the only evidence that its alleged false statements would have been material was "self-serving testimony . . . lack[ing] any corroboration." [ECF No. 163 at 2]. The premise of this argument is wrong. Testimony need not be corroborated for the jury to accept or rely on it. E.g., Intercity Maint. Co. v. Local 254, SEIU, 241 F.3d 82, 88 (1st Cir. 2001) ("[T]he jury was entitled to consider Bouthillette's uncorroborated testimony.").

### 3. Intent

Cashman reprises its arguments as to false representations and asserts generally that "[t]he record contains no competent evidence from which a reasonable jury could find that this element has been established." [ECF No. 163 at 3]. For the reasons elaborated above, the jury reasonably could have concluded that Cashman made false statements, and extensive trial testimony was elicited to the effect that several Cashman employees were aware of far more information about the condition of the barge than what was disclosed to HC&D. From these facts, in turn, the jury reasonably could have concluded that Cashman's false representations were intentional. See Roadmaster Indus., Inc. v. Columbia Mfg. Co., Inc., 893 F. Supp. 1162, 1176 (D. Mass. 1995) ("[I]t has been held in a long line of cases that 'the charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge; and in such case it is not necessary

to make any further proof of an actual intent to deceive.'" (quoting Logan v. Equip. Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1199 (D. Mass. 1990) (emphasis added))).

### 4.  Reliance

Cashman argues that HC&D only established its reliance on third-party statements, as opposed to statements attributable to Cashman itself.  [ECF No. 163 at 3].  As explained above, the jury could have concluded from context that Cashman adopted the third-party statements and documents that it relayed to HC&D.

### 5.  Reasonableness of Reliance

Cashman contends that the trial evidence "clearly demonstrated that Plaintiff was not reasonable in its alleged reliance" because "it conducted no due diligence . . . [and] failed to make even a cursory inspection of the barge, . . . despite executing a contract wherein it disclaimed any and all statements as to the barge, whether made by Cashman or any third parties." [ECF No. 163 at 3].  Reasonableness is a factual issue for the jury, see Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 242 (D. Mass. 1999); Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 369 (D. Mass. 2002), and the evidence presented by HC&D at trial concerning standard practice in barge transactions was sufficient for the jury to conclude that HC&D's approach, and its reliance on the limited information available to it, was reasonable under the circumstances, see Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 226–27 (1st Cir. 2003); Gattineri v. Wynn MA, LLC, 63 F.4th 71, 88 (1st Cir. 2023).

### 6.  Financial Loss

Finally, Cashman asserts that any loss suffered by HC&D was attributable to its decision to "cold-stack[]" a viable working barge that could have generated millions of dollars in revenue.

[ECF No. 163 at 3–4]. The Court understands this to be an argument concerning failure to mitigate. The jury was asked two questions relevant to this point: (1) whether any loss suffered by HC&D was "caused, in whole or in part, by a person other than [Cashman] and/or other circumstances outside of [Cashman's] control," and (2) whether "HC&D fail[ed] to mitigate . . . damages." [ECF No. 157 at 4]. It answered both questions in the negative, and the trial record, which included testimony, albeit contested, about what HC&D might have done to mitigate, was sufficient to support the verdict.

### B.    HC&D's Motion

#### 1.    Benefit-of-the-Bargain Damages

HC&D contends that the jury's award of $885,000 in benefit-of-the-bargain damages "is entirely unsupported by the evidence presented at trial." [ECF No. 165 at 12]. The basis for this argument is that HC&D paid $1,985,500 for the barge, while "the highest scrap value figure heard by the jury was approximately $378,000," which came from HC&D's expert, Fred Rodolf. [Id.]. Accordingly, HC&D argues, the lowest sum of benefit-of-the-bargain damages at which the jury reasonably could have arrived was the difference between the purchase price and the highest scrap value stated at trial. [Id. at 12–13]. The jury, however, was not required to accept HC&D's conclusion that the barge only retained scrap value. See, e.g., SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC, No. 21-cv-30068, 2025 WL 2124267, at *5 (D. Mass. July 29, 2025). For example, Volner testified that when the barge was being towed to Oakley, HC&D commissioned a new condition and valuation survey, which valued the barge at $1.2 million. Given HC&D's reliance on C&V surveys at trial, the jury might have used that 2021 C&V as an objective indicator of the barge's value when it was delivered to HC&D. Alternatively, Cashman presented expert testimony that in its current condition, the barge still

had significant value and earning potential.  The jury was free to weigh and compare the various measures available to it, and the Court finds ample support in the trial record for the jury's conclusion that the barge was worth $885,000 less than what HC&D paid for it—that is, about $1.1 million.

### 2.    Consequential Damages

HC&D argues that the $1,584,487.90 that it sought in consequential damages was supported by "uncontradicted, unimpeached documentary proof of liquidated expenditures," [ECF No. 165 at 9], and that because the jury concluded that HC&D had not failed to mitigate damages, there was no basis for reducing that total, [id. at 10–11].  The Court disagrees.  See SonicSolutions, 2025 WL 2124267, at *4 n.5 ("[R]ule 50(b) is not a tool for reweighing the evidence regarding damages or critiquing the jury's damages calculations.  Rather, the court simply considers whether evidence was in the record through which the jury could have reached a damages calculation.").

As HC&D notes, "the jury found entirely in favor of HC&D" on liability, [ECF No. 165 at 6], and as such, HC&D was "entitle[d] to its documented consequential damages . . . as a matter of law," [id. at 9].[8]  Having reached that conclusion, however, the jury's work was not yet done, because it was further required to determine which of HC&D's proven expenses were caused by Cashman's fraud.  The conclusion that HC&D had properly mitigated its damages after the fact did not imply that every expense incurred by HC&D was incidental or

---

[8] HC&D was entitled to recover both incidental and consequential damages.  See [ECF No. 165 at 7]; accord [ECF No. 125 (citing Mass. Gen. Laws ch. 106, §§ 2-714, 2-715, 2-721)].  Though the jury was not instructed in these technical terms, it was instructed that HC&D was entitled to recover for any financial losses caused by its reliance on Cashman's misrepresentations, which the Court is satisfied captured the relevant principles of Massachusetts law.

consequential to Cashman's misrepresentation.  See Hendricks & Assocs, Inc. v. Daewoo Corp., 923 F.2d 209, 213–14 (1st Cir. 1991) (surveying limits on consequential damages under Massachusetts law).  The jury was free to examine each expense that HC&D asserted and to decide whether and how much of that expense was attributable to Cashman's misrepresentation.  See 1 White & Summers, Uniform Commercial Code §§ 7:21–25 (6th ed. June 2026 update); Productora E Importadora De Papel, S.A. De C.V. v. Fleming, 383 N.E.2d 1129, 1137 (Mass. 1978) (relying on White & Summers to interpret Uniform Commercial Code under Massachusetts law).  Here, the jury could have concluded that many of the costs offered by HC&D were inherent in the transaction but unrelated to Cashman's fraud (particularly in light of HC&D's decision to retain the barge, which the jury found was worth more than $1 million) or were due to subsequent decisions by HC&D that were neither failures to mitigate nor incidental or consequential to Cashman's fraud.  Accordingly, Cashman had the right to concede that the amounts were "legitimate" and "paid by HC&D," [ECF No. 165 at 10–11], but to cast doubt on whether they were attributable to any misrepresentation that it made in connection with the transaction.  On the record at trial, there was ample support for the jury to conclude that a significant portion of the sums proved by HC&D were not caused by Cashman's misrepresentation, and the Court will not second-guess the jury's conclusion on this point.

### C.    New Trial

In the alternative, HC&D argues that the Court should order a new trial solely on damages, because "the damages award is unsupported by, and contrary to the weight of, the credible evidence."  [ECF No. 165 at 13].  Against the evidence it offered in support of its damages figure, including both testimony and invoices, it notes that "Cashman made no attempt to undercut the[] amounts" claimed, whether by challenging the accuracy of the invoices or by

attacking the credibility of HC&D's witness testimony as to damages. [Id. at 14]. Accordingly, HC&D concludes, "the jury had no basis whatsoever upon which it could have justified a reduction in the amount of incidental and consequential damages sought." [Id.]. It contends that the figure awarded by the jury is "odd" in light of the record at trial, because "there is no combination of invoices that result[s] in the figure selected by the jury," and as such there must be no "mathematical basis for the figure." [Id.]. HC&D goes on to argue that, without a discernible mathematical basis, "it is impossible for the [awarded amount] . . . to have been the product of a 'rational appraisal or estimate of the damages.'" [Id. (quoting Irwin v. Eclectic Dining, Inc., 155 F. Supp. 3d 126, 128 (D. Mass. 2016))]. HC&D also makes a similar argument as to benefit-of-the-bargain damages. [Id. at 15].

For the reasons explained above, the jury had reason to award less in damages than the sum of the expenses presented by HC&D. Further, jury awards do not need to be clearly based on a particular mathematical approach to be affirmed, particularly where, as here, the jury was required to decide what subset of the total of various sums introduced by HC&D was properly attributable to Cashman's malfeasance. See Fleming, 383 N.E.2d at 1138 ("[Plaintiff] need not prove its damages with mathematical exactness."); cf. Delano Growers' Co-op Winery v. Supreme Wine Co., 473 N.E.2d 1066, 1077 (Mass. 1985) (approving judge's imprecise assessment of lost-good-faith damages that depended on his weighing of competing evidence); Incase Inc. v. Timex Corp., 488 F.3d 46, 54 (1st Cir. 2007) (accepting jury's estimation of the reasonable value of services provided in an unjust enrichment case but nonetheless affirming JMOL for reasons not relevant here). The fact that the amount of damages awarded by a jury may not reflect a clear relationship to the amounts offered by the parties at trial is no reason to order a new trial.

14

HC&D also argues that the Court should revisit previous rulings and order a new trial in which HC&D is permitted to present evidence of rescission and cover damages, which the Court excluded, for unrelated reasons, in two separate orders, [ECF No. 125 (rescission)]; [ECF No. 155 (cover)].  The Court declines to revisit those rulings at this stage.

IV.    **CONCLUSION**

For the foregoing reasons, the parties' motions for judgment as a matter of law, or a new trial, [ECF No. 163]; [ECF No. 164], are **DENIED**, and the jury verdict will stand.

**SO ORDERED.**

August 11, 2026                                          */s/ Allison D. Burroughs*
                                                              ALLISON D. BURROUGHS
                                                              U.S. DISTRICT JUDGE

15